UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal No: 25-CR-7268-JCB |
| ) | |
| ALEJANDRO DAVID REYES AGUILAR, ) | |
| ) | |
| Defendant ) | |

**GOVERNMENT'S OBJECTION TO MAGISTRATE ORDER**

On June 4, 2025, Alejandro David Reyes Aguilar ("Reyes") was arrested and charged by criminal complaint. The following day, the charges were dismissed. Dkt. 8, 9. In the months that followed the termination of charges, the magistrate judge has entered multiple orders, including an order to return property, an order to produce discovery, an order to show cause, an order to file a declaration from agency counsel related to agency regulations, and an order scheduling an evidentiary hearing. In the order scheduling that evidentiary hearing, the magistrate judge designated the specific witnesses that should attend the hearing, directed the government to call all of those witnesses, and indicated that the magistrate judge intended to participate in questioning those witnesses. In that order, the magistrate judge also made clear that she had doubts as to the credibility of the witnesses (none of whom have yet testified before her) and was considering sanctions against the assigned Assistant U.S. Attorney for failing to keep the magistrate judge updated as to the return of Reyes's property, specifically, a wallet and car keys. Despite reimbursing Reyes $725 for that wallet and those keys, the magistrate judge denied the government's motion to cancel the evidentiary hearing or reconsider its scope.

The United States Attorney hereby objects to any further proceedings before the magistrate judge in this case. In this terminated criminal case with no pending charges, the magistrate judge lacks jurisdiction to adjudicate a Rule 41 motion and any ancillary proceedings.

Even if a Rule 41 motion provided jurisdiction, it would still be erroneous to hold an evidentiary hearing. There is no authority to issue monetary sanctions in the context of a Rule 41 motion and no basis to otherwise impose sanctions for a supposed violation of a court order to return property, where the government has explained that it does not have, nor can it find, the lost property in this case. Nevertheless, the government has already reimbursed Reyes for the full value of the property that the government lost. There is nothing left to do, and the Court should vacate the magistrate judge's order below.

**Background**

On June 4, 2025, Reyes was arrested and charged by criminal complaint with assaulting, resisting, opposing, impeding, intimidating, or interfering with a federal officer in violation of 18 U.S.C. § 111. Dkt. 2. When Reyes appeared in court, agents returned his driver's license and permanent resident card to his attorney. Dkt. 14.[1] The next day, the charges against Reyes were dismissed. Dkt. 8, 9.

On June 11, 2025, the government received a request from defense counsel regarding the return of personal items, specifically a wallet and car keys, taken from Reyes during his arrest. That same day, the government forwarded the request to FBI Special Agent Biagiotti, the affiant of the criminal complaint, who thereafter coordinated with individuals from the agencies involved in Reyes's arrest, including from ICE-ERO,[2] FBI, DEA, and HSI, to attempt to locate Reyes's property. The government was in consistent communication regarding the issue with defense

---

[1] Reyes's motion for a show cause hearing (Dkt. 14) states that Special Agent Biagiotti, the complaint affiant, returned Reyes's driver's license and Permanent Resident card to defense counsel. Defense counsel mistook another agent for Special Agent Biagiotti. Dkt. 25 at 13. Special Agent Biagiotti was not involved in Reyes's arrest or booking, did not interact with him or his attorney, and did not see or touch any of his property. Special Agent Biagiotti did observe the initial appearance from the back of the courtroom. Defense counsel has acknowledged the mistake.

[2] In previous filings, the government overbroadly referred to ERO as "ICE." The government now refers to that segment of the agency as "ICE-ERO."

counsel from that day forward. Dkt. 14 at 2. As of June 17, 2025, Reyes's property had still not been located. Despite knowing that the attempts to locate the property had failed, Reyes filed a motion for return of property. Dkt. 11. The government did not oppose that motion because it did not oppose the return of any personal property of Reyes that might have been in the government's custody. Dkt. 17 at 1. In an electronic order issued that same day, the Court (Boal, M.J.) granted the motion, ordering that "[t]he law enforcement agent(s)/agency in possession of the defendant's property must return it to the Federal Defender Office in Boston by 5:00 p.m. on Friday, June 20, 2025." Dkt. 12. Following the entry of this order, the assigned Assistant U.S. Attorney maintained regular contact with defense counsel, agents, and other representatives from the various agencies involved to try to locate Reyes's property, to no avail. On June 23, 2025, the government informed defense counsel that the FBI would be able to compensate Reyes for the value of the property. Dkt. 36 at 4.

Instead of seeking compensation for the lost property, on June 24, 2025, Reyes filed a motion for a show cause hearing "for inquiry as to why the government has failed to comply with the Court's order [], and for further remedy as appropriate." Dkt. 14 at 1. On June 25, 2025, the magistrate judge granted the motion and scheduled an evidentiary hearing for July 10, 2025:

> …to determine among other things, who was present during the arrest (or otherwise interacted with Reyes between the time of his arrest and his arrival at the courthouse), what property was seized, taken, or removed from Reyes, the chain of custody of that property, who currently possesses the property (including which agency), where the property is located, why it has not been returned as ordered by this Court, and whether any sanctions should be imposed.
> Dkt. 15.

The order also directed the government to file a response and to produce "all reports and documents" about the arrest, interactions with Reyes, the seizure of his property and its subsequent possession by the government, and regulations and procedures from each involved agency regarding property seized during an arrest. *Id*.

On July 1, 2025, the government informed defense counsel that Reyes could seek remuneration from ICE-ERO by completing a form SF-95 and provided a copy of that form. Dkt. 36 at 4.

On July 2, 2025, the government filed a Response to and Partial Motion to Reconsider Court Order, attaching sworn declarations from the FBI, HSI, and DEA agents and ICE-ERO deportation officer present at the time of Reyes's arrest in Lynn, Massachusetts, on June 4. Dkt. 17. The declarations establish that Reyes was arrested at a location on Walnut Street in Lynn and then transported to the Pine Grove Cemetery in Lynn because a crowd had gathered at the arrest site. Reyes was searched there by FBI SA Gutierrez and then transported, with at least one other person in custody, to an ICE facility in Burlington. Thereafter, he was transported to the federal courthouse in Boston. After SA Gutierrez removed a wallet from Reyes's pocket, no other person present at either the site of the arrest or the Pine Grove Cemetery recalls handling the wallet, or seeing the wallet after Reyes's permanent resident card was removed from it. Further, no person present at either site recalls seeing or handling Reyes's keys. *See* Dkt. 17-1, 17-2, 17-3, 17-4, 17-5, and 17-6.

In its response and motion to reconsider, the government indicated that it had conferred with counsel for the FBI, HSI, DEA, and ICE-ERO to confirm that no additional agents or other persons were present at either of those locations, and represented that the ICE facility at Burlington, the arrest site and cemetery in Lynn, the vehicles driven by agents on the day of arrest, and the USMS cell block had been searched for the missing property. Dkt. 17 at 2. The government's response also indicated that it had provided defense counsel the form necessary to initiate a lost property claim with ICE-ERO and that FBI was willing to expedite the FBI's process to compensate Reyes for the lost property. *Id*. Based on the submission of the sworn declarations and the availability of processes by which Reyes could be compensated, the government requested

4

that the magistrate judge reconsider the portions of her order convening a hearing on the motion to show cause and requiring the government to produce certain discovery (which was not requested by Reyes). *Id*. at 2-3.

The magistrate judge issued an electronic order on July 3, 2025, denying the government's partial motion to reconsider, extending the deadline for production of the documents at issue, cancelling the evidentiary hearing, and scheduling a hearing for July 10, 2025, to "discuss, among other things, the scheduling of an evidentiary hearing." Dkt. 18. At the hearing, the magistrate judge noted:

> The government's submissions raise a number of additional questions. For example, according to the government's own submissions, one of the agents in fact removed the wallet from Reyes and gave it to another unknown agent. Yet none of the other agents have admitted to being the one that took the wallet. None of the agents admit to being the person that removed the license and green card from the wallet and gave those to Officer Leydon. Rather, they all disclaim any knowledge about what happened to the wallet. … In addition, all of the unanswered questions raise additional questions and possible credibility issues.
>
> Dkt. 27 at 10.

The magistrate judge also raised "the very significant issue that the government simply ignored the Court's first order. At the very minimum, the government should have requested an extension of the deadline for returning the property. It should have alerted the Court that it didn't have the property." *Id*. at 10-11. In response, the government characterized the lack of communication with the Court as an oversight and explained that the Assistant U.S. Attorney had been in communication with defense counsel about the issue. *Id*. at 17-19. The government further represented that the FBI would address the administrative request for compensation for the lost property. *Id*. at 19.

The magistrate judge, noting, "I assume Ms. Olson wants to get compensation for her client, right?", proposed to hold "the resolution of this issue open, and…not schedule a hearing today but hold it in abeyance" to facilitate compensation by the FBI "[a]nd then, depending on

5

people's views, we can go forward or not go forward with the evidentiary hearing."[3]  *Id*. at 21-22.  Counsel commented that she would confer with Reyes to compile a "definitive and final list" of the missing property and stated they were "close to that now."[4]  *Id*. at 24.  Counsel explicitly mentioned (three times) a desire to obtain body-worn camera footage.  *Id*. at 22-26.

The magistrate judge thereafter issued an order scheduling a hearing on August 14, 2025 "to determine, among other things, who was present during the arrest or at the Pine Grove Cemetery (or otherwise interacted with Reyes between the time of his arrest and his arrival at the courthouse), what property was seized, taken, or removed from Reyes, the chain of custody of that property, where the property may be located now, and whether any sanctions should be imposed." Dkt. 26 at 2.

The government engaged in additional conversations with defense counsel regarding compensation on July 10, 2025.[5]  Dkt. 36 at 4.  On July 11, 2025, the government connected defense counsel via e-mail with counsel for the FBI and requested an estimate for the value of the property.  *Id*.  Having received no estimate from Reyes, on July 18, 2025, based on the information provided by defense counsel during previous conversations, the government sent a letter to defense counsel setting forth a dollar amount that the FBI estimated was owed to Reyes.  *Id*.  Counsel responded substantively on July 30, 2025, providing the government for the first time with information regarding the cost to replace Reyes's keys and confirming the accuracy of the other

---

[3] In the supplemental order, Dkt. 45 at 5, the magistrate judge indicates that the evidentiary hearing was cancelled "given the government's failure to timely produce the reports" that were the subject of the government's partial motion to reconsider (Dkt. 17).  The electronic order denying the motion to reconsider did not reference this basis for cancellation of the hearing (and ordered production of the documents by July 8, two days prior to the originally scheduled hearing).  *See* Dkt. 18.  The government complied with that deadline.  *See* Dkt. 25 at 5-6.

[4] Defense counsel notified the government before the hearing that, in addition to the items identified earlier, Reyes also claimed to have $175 in cash in his wallet.

[5] That same date, defense counsel confirmed that she was not seeking sanctions against the Assistant U.S. Attorney.  *See* Dkt. 45 at 8, n.4; Dkt. 36 at 2, n.2.

aspects of the FBI's estimate. *Id*. Based on that information, on July 31, 2025, the government sent defense counsel an updated estimate, reflecting the additional expenses that Reyes reported to have incurred. *Id.* at 5. The government emailed the defense again to verify the accuracy of the updated estimate on August 1, 5, and 6, 2025. On August 7, 2025, counsel informed the government that the FBI offer, $725, reflected what was required for Reyes to replace his personal property.[6] *Id*. Reyes was not asked to sign any sort of waiver of any rights he may have to file other claims.

That same day (August 7), the government filed a motion to cancel the August 14, 2025 hearing. Dkt. 36. In its filing, the government noted that it had provided body-worn camera footage and reports regarding Reyes's arrest, that it had confirmed with ICE-ERO that no inventory or intake reports were written at the time of his intake at Burlington ERO, and that Reyes had accepted an offer of compensation from the FBI. *Id*. at 3-5. Reyes filed an opposition on August 9, 2025, acknowledging that Reyes had accepted an offer of compensation but that "questions remain about what happened to his property on the day of his arrest" and claiming that a hearing "might spark a government investigation that results in the discovery or recovery" of the property and would "provide a public record of the government's mishandling of property that could have the salutary effect of deterring the government from such future mishaps." Dkt. 37 at 1-2 (internal citations omitted).

On August 11, 2025, the magistrate judge denied the motion to cancel the hearing in an electronic order. Dkt. 38. That same day, the government filed a Motion for Stay of Execution of

---

[6] Incorporating input from Reyes, the accepted offer is broken down as follows: $360 to replace a Ford truck key; $100 to replace the wallet; $175 to replace an estimated amount of cash in the wallet; $60 to replace an OSHA card; $25 to replace a client's house key; and $5 estimated in loose change. Reyes declined to provide the FBI with his banking and routing information to facilitate an electronic payment; a paper check in the amount of $725 was delivered to the defense team on August 26, 2025.

Court Orders, signaling its intent to file an objection to the magistrate judge's order denying the government's Motion to Cancel Evidentiary Hearing (Dkt. 38) and noting the assigned Assistant U.S. Attorney's trial schedule.[7] Following a hearing, the magistrate judge cancelled the August 14 hearing and later, on August 20, 2025, issued a supplemental order in anticipation of this objection. Dkt. 45. In the supplemental order, the magistrate judge outlined two bases for the evidentiary hearing. First: "to better understand the circumstances around the seizure (or not) of Reyes' personal property at the time of the arrest," given her inability to "make any meaningful determinations as to what actually happened based on the documents and declarations because…they are rife with inconsistencies and omissions." *Id*. at 8. Second: to satisfy her "vested interest in understanding why [the order to return property] was not complied with and whether or not there should be any sanctions as a result." *Id*. at 8-9.

**Argument**

The government objects to the magistrate judge's denial of its Motion to Cancel Hearing (Dkt. 36) on three grounds. First, the magistrate judge lacks jurisdiction in the proceedings below. Second, the government disagrees that the magistrate judge is unable to make a meaningful determination of what happened to the property based on the evidence produced to date. Third, sanctions against the Assistant U.S. Attorney are unwarranted and the Court need not engage in a hearing to determine sanctions commensurate with the violation of the court order here: failure to provide Reyes with property that was lost.

1. <u>The magistrate judge lacks jurisdiction over the proceedings below</u>

The Court should vacate the below order because the magistrate judge lacks jurisdiction to hold an evidentiary hearing or conduct further proceedings in this case. Magistrate judge

---

[7] The motion also sought a stay of execution of an earlier-issued order regarding a discovery protective order, but that issue is not directly relevant to this filing.

8

jurisdiction is governed primarily by the Federal Magistrates Act, 28 U.S.C. § 631 et. seq., and is limited to three areas, none of which apply to this matter. *See In the Matter of the Seach of 2124 Altura Verde Ln. NE, Albuquerque, NM 87110*, 2017 WL 6550862 (D. N.M. 2017) (denying motion for return of property without prejudice because magistrate judge lacked jurisdiction); *In the Matter of the Search of S&S Custom Cycle Shop*, 372 F.Supp.2d 1048, (S.D. Ohio 2003) (same).

First, magistrate judges have the powers and duties that were typically exercised by their statutory predecessors, United States commissioners. 28 U.S.C. § 636(a)(1). The authority of United States commissioners to adjudicate motions for return of property was removed in 1944. "[A]s originally adopted, Rule 41(e) provided that while under existing law a motion to suppress evidence or to compel return of property obtained by illegal search and seizure may be made either before a commissioner subject to review by the court on motion, or before the court, th[is] rule provides that such motion may be made only before the court." *United States v. Douleh*, 220 F.R.D. 391, 394-95 (W.D.N.Y. 2003). (citing Fed. R. Crim. P. 41(e) advisory committee's note (1944)).

Second, a district judge may refer certain pretrial matters to a magistrate judge for decision or for a report and recommendation, depending on whether the specific matter at issue is dispositive. 28 U.S.C. § 636(b). This includes motions under Rule 41(g) based on the 1989 amendments to Rule 41. *See Douleh*, 220 F.R.D. at 394; Local M.J. Rule 15(c)(5). But here, there is no order of referral. The criminal complaint against Reyes was dismissed and a district judge was never assigned.

Third, the parties can consent to magistrate judge jurisdiction in civil cases. 28 U.S.C. § 636(a)(3). The government does not consent to any magistrate jurisdiction in this matter and the procedures necessary for consent jurisdiction have not been followed. *See In re Search of Scranton*

*Housing Authority*, 487 F.Supp.2d 530, 535 (M.D. Pa. 2007).

The government recognizes that it participated in the litigation below without objecting to the magistrate judge's jurisdiction. By dismissing the criminal complaint in a timely fashion, reimbursing Reyes for the value of his lost property, and attempting to answer the magistrate judge's concerns, the government attempted to be helpful and responsive to the issues that were presented. But the magistrate judge has decided to litigate the case in Reyes's stead, to include ordering discovery that was not requested, designating which witnesses should be called at the hearing, questioning the credibility of witnesses that have not testified, and signaling an intent to explore sanctions against the assigned Assistant U.S. Attorney at the hearing. To the extent that the magistrate judge's comments indicate that she has prejudged the adverse credibility finding on a cold record, that alone is reversible error. *See United States v. Thoms*, 684 F.3d 893, 904 (9th Cir. 2012) ("Put another way, before a district court calls a police officer a liar, there is a strong presumption that the judge should look him in the eye first."). The magistrate judge's order should be vacated.

2. The Rule 41(g) Motion May Properly be Adjudicated on the Present Record

The magistrate judge has construed Reyes's Motion for Show Cause Hearing as a motion made pursuant to Federal Rule of Criminal Procedure 41(g). Rule 41(g) provides that a "person aggrieved…by the deprivation of property may move for the property's return." "Where criminal proceedings against the movant have already been completed, a district court should treat a rule 41(e)[8] motion as a civil complaint." *U.S. v. Giraldo*, 45 F.3d 509, 511 (1st Cir. 1995). When considering a Rule 41(g) motion, "[t]he court must receive evidence on any factual issue necessary to decide the motion." *See* Fed. R. Crim. P. 41(g). "Affidavits or documentary evidence…may suffice to support the district court's determination in a given case." *U.S. v. Crooker*, No. 04-

---

[8] Rule 41(e) was the precursor to Rule 41(g).

30034-PBS, 2015 WL 13234478 at *2 n.1 (D. Mass. Dec. 18, 2015) (quoting *U.S. v. Cardona-Sandoval*, 518 F.3d 13, 16 (1st Cir. 2008)).

The documents and declarations provided to the magistrate judge and Reyes contain sufficient information for the Court to rule on the motion. *See Cardona-Sandoval*, 518 F.3d at 16 ("We have not held and do not now hold that an evidentiary hearing is necessary. Affidavits or documentary evidence, such as chain of custody records, may suffice to support the district court's determination in a given case."); *see also U.S. v. Mendez*, No. CR 06-022-02 ML, 2008 WL 2220033, at *2 (D.R.I. May 28, 2008) ("[b]ecause Rule 41(g) proceedings are civil in nature, the civil preponderance-of-the-evidence standard applies.").

This is not a case where the government has made a conclusory, unsupported claim about the whereabouts of the property in question. In *Cardona-Sandoval*, for example, the government's response failed to address the status (*i.e.*, location or destruction) of enumerated items identified by the defendant. *Id*. at 15-16. *See also United States v. Chambers*, 192 F.3d 374, 378 (3d Cir. 1999) (government did not meet its burden and court did not discharge its duty under Rule 41(e) because no evidence was offered or taken); *Peloro v. United States*, 488 F.3d 163, 178 (3d Cir. 2007) (because no dispute that certificated securities had been transferred by federal defendants, determination of facts without a hearing was proper).

Nor is it a case where an evidentiary hearing will likely determine "what, in fact, happened to the property." *Cardona-Sandoval* at 17. Here, a sworn declaration has been submitted for every person the government understands to have knowledge regarding the circumstances surrounding the loss of Reyes's wallet and keys at the time of his arrest.⁹ The declarations established that

---

⁹ The magistrate judge ordered HSI SA Dale Gargac to be present at the hearing. He did not encounter Reyes until Reyes arrived at Burlington ERO. The government did not seek a declaration from him. According to documentation provided to Reyes and the magistrate judge, SA Gargac located loose change in Reyes's pockets. The magistrate judge also ordered FBI SA

11

after FBI SA Gutierrez removed the wallet from Reyes's pocket, no other person present at either the site of the arrest or the Pine Grove Cemetery recalls handling the wallet, or seeing the wallet after Reyes's permanent resident card was removed from it. Further, no person present at either site recalls seeing or handling Reyes's keys. *See* Dkt. 17-1, 17-2, 17-3, 17-4, 17-5, and 17-6. The government acknowledges that the declarations do not answer the ultimate question: Where is the missing property? But there is no reason to believe that any of these witnesses will provide different information when questioned under oath as they did by way of sworn declaration. Reyes, for one, has not suggested, by affidavit or otherwise, an alternate explanation for the whereabouts of his property.

The government disagrees that the "Court is unable to make any meaningful determinations as to what actually happened based on the documents and declarations because, as set forth above, they are rife with inconsistencies and omissions." Dkt. 45 at 8. The magistrate judge specifically identified the fact that one agent, FBI SA Gutierrez, recalled retrieving Reyes's wallet from his pocket, handing it to an agent behind him, but did not remember who that agent was as being inconsistent with the other agents' lack of memory or knowledge about who took the wallet from him. Dkt. 45 at 5. However, variation in memory among different individuals involved in a high-stress interaction that lasted a matter of mere minutes is not the same as inconsistency. Furthermore, given that each declaration describes the perspective of each respective declarant, there is no reason to believe that requiring them to testify in court will uncover any different observations that might shed light on the location of Reyes's property.

The magistrate judge also noted that the agents equipped with body-worn cameras had them turned off at the cemetery. Dkt. 45 at 5. While the magistrate judge commented regarding

---

Casey Biagiotti to be present. She was the complaint affiant but only became involved post-arrest. The government therefore did not seek a declaration from her.

"some sort of curious explanations" for the deactivation of the body-worn cameras, Dkt. 25 at 12, the government does not understand what questions might be posed at a hearing about this fact that would be intended to, or likely succeed in, jogging or refreshing the memory of any of the agents present. Neither the magistrate judge nor defense counsel has identified what those actual questions (as opposed to, *e.g.*, suspicion of malfeasance) might be.

Here, the evidence before the magistrate judge establishes that the various locations where the wallet *might* have been located (accidentally or otherwise) have been searched; the property was not found at the scene of the arrest, at the cemetery, at Burlington ERO, along the route from Lynn to Burlington, the USMS cellblock, or in any of the agents' cars. *See* Dkt. 17-1—17-6. Of course, if they knew where the property was, it would not be lost. That is where the supposed difficulty lies in this case; while such a conclusion may feel unsatisfying, the evidence provided to date proves by a preponderance that that is what happened. The Court need not—and thus, should not—convene an evidentiary hearing at which it is requiring the government to call eight witnesses to give testimony.

    3. <u>Sanctions Are Not Warranted</u>

The government takes issue with the magistrate judge's observation that "there is no dispute that the government violated this Court's June 17, 2025, order." Dkt. 45 at 8. The order stated that "[t]he law enforcement agent(s)/agency in possession of Reyes's property must return it to the Federal Defender Office in Boston by 5:00 p.m. on Friday, June 20, 2025." Dkt. 12. Clearly, that did not happen. While the Court may have "a vested interest in understanding why its order was not complied with," Dkt. 45 at 9, as outlined above, the government has provided information that answers that question. There is no evidence to support a finding that the government intentionally violated any court order. Agents did not return the property to the Federal Defender Office because they do not have the property – it is lost. The government owned

13

up to this fact immediately after conducting an investigation and no further probing will change this fact.

While lower courts are "imbued with an array of 'inherent powers' in performing their case-management function [which were] never specifically enumerated in the Constitution or in legislative enactments, yet 'necessary to the exercise of all other enumerated judicial powers,'" these powers are not properly exercised in these circumstances. *United States v. Kouri-Perez*, 187 F.3d 1, 7 (1st Cir. 1999) (internal citations omitted; cleaned up). For example, "[t]hese implicit powers include the judicial authority to sanction counsel for litigation abuses which threaten to impugn the district court's integrity or disrupt its efficient management of the proceedings." *Id.* (citing *Chambers v. NASCO, Inc.,* 501 U.S. 32, 43 (1991)). A court may, for instance, assess attorney's fees against a litigant "as a sanction for the willful disobedience of a court order." *Chambers*, 501 U.S. at 45. "Exercising this authority, courts may levy sanctions (including punitive sanctions) for such varied purposes as disciplining attorneys, remedying fraud on the court, and preventing the disruption of ongoing proceedings." *In re Charbono*, 790 F.3d 80, 85–86 (1st Cir. 2015) (citing *Chambers* at 43–44).

Where an inherent-power sanction does not take the form of an award of attorneys' fees, a finding of bad faith is not ordinarily required.[10] *Id.* at 88. Nevertheless, when a court exercises its "considerable discretion" to confront a violation of its own order, it "must give individualized consideration to the particular circumstances…and balance a myriad of factors." *Id.* at 89 (internal citations omitted).

Here, there is no violation to confront. The magistrate judge's order directed federal agents

---

[10] "[P]rinciples of sovereign immunity bar a federal court from invoking its supervisory power to compel the federal government to pay attorneys' fees and costs as a sanction for prosecutorial misconduct in a criminal case." *United States v. Horn*, 29 F.3d 754, 770 (1st Cir. 1994).

to perform a specific task: return specific items to a specific place. The order included no explicit requirement that the Assistant U.S. Attorney complete any particular step by any particular date. Dkt. 18. As outlined above, the fact that the government did not file a motion to alert the Court that agents did not have the property is not the product of bad faith or some other willful violation of a court order. But best practices is a different question than explicit violation of a court order. If the magistrate judge had included a specific obligation for the Assistant U.S. Attorney to, for example, file a status report to apprise the Court of the return of property, she would have complied. There is no basis in the record to believe otherwise; the government has complied with every other such directive issued in this case and, as the government explained both at the July 10 hearing and in subsequent filings, the Assistant U.S. Attorney worked diligently to, first, determine where the property was, and then expedite remuneration to Reyes once it was determined to be lost. As it stands, there is no basis upon which to explore what sanctions might be appropriate as to the Assistant U.S. Attorney because there is no clear violation of any order by the Assistant U.S. Attorney. *See, e.g., United States v. Horn*, 29 F.3d 754, 760 (1st Cir. 1994) (inherent power may be dedicated to implement a remedy for violation of recognized rights, to preserve judicial integrity, and to deter illegal conduct).[11]

The question, then, is whether sanctions are otherwise available in the circumstances of this case. A court "lacks jurisdiction to grant money damages" for lost property in a Rule 41(g) context. *United States v. Schomaker*, 2006 WL 1236841, at *2 (D.N.H. May 9, 2006) (citing *U.S. v. Jones*, 225 F.3d 468, 470 (1st Cir. 2000)). Thus, the Court cannot grant money damages to Mr. Reyes based on his Rule 41(g) motion.

---

[11] At the August 11 hearing, the magistrate judge informed the parties that in her discussion of sanctions, she was not referring to attorney misconduct. The supplemental order corroborates this assurance, citing the overlap between the Rule 41(g) issue and the sanctions issue, which "covers much of the same subject matter, such as how the agents initially handled the property, when they first looked for it after Reyes's arrest, and the efforts that they made to do so."

However, the appropriate remedy for the loss of Mr. Reyes's property—which, really, is the nature of the violation of the court order: failure to return the property—is that he be fully remunerated.[12] Once the government learned that the property had apparently been lost, it diligently attempted to facilitate restitution for Mr. Reyes in as expedited a manner as possible and has succeeded in doing so, even where response from the defense was lagging. As stated above, Mr. Reyes has not been asked to sign any sort of waiver of any rights he may have to file other claims.

No sanctions are necessary here. *See United States v. Horn*, 29 F.3d 754, 760 (1st Cir. 1994) (stating that the supervisory power should not be used to "justify an extreme remedy when, short of such heroic measures, the means are at hand to construct a satisfactory anodyne more narrowly tailored to the objective"). *See also United States v. Pimentel-Soto*, 957 F.3d 82, 87 (1st Cir. 2020) ("[W]e reiterate that these powers must be exercised with restraint and circumspection."). The Court need not—and thus, should not—convene an evidentiary hearing involving the testimony of eight witnesses for that purpose.

## CONCLUSION

For all the foregoing reasons, the government objects to the magistrate judge's orders convening a hearing under Rule 41(g) or otherwise. The government does not have, nor can it find, the lost property in this case. Nevertheless, the government has already reimbursed Reyes for the full value of the property that the government lost. There is nothing left to do, and the Court should VACATE the magistrate judge's order below.

---

[12] If Mr. Reyes had filed a FTCA claim for the lost property, the remedy would be remuneration. The FBI has satisfied that remedy. While, as the magistrate judge observed, this is not a sanction, Dkt. 45 at 7, n.2, it is surely worth something to Reyes to avoid pursuit of the often-protracted civil process in which most similarly situated defendants must engage.

                                                    Respectfully submitted,

                                                    */s/ Leah B. Foley*
                                                    LEAH B. FOLEY
                                                    United States Attorney

Date: September 3, 2025

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants.

## RULE 7.1 CERTIFICATION

I hereby certify that the government has conferred on this date with counsel for Mr. Reyes, who intends to file a response to the government's Objection to Magistrate Order.

                                                      */s/ Anne Paruti*
Dated: September 3, 2025                         Assistant United States Attorney